## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

COINBASE FINANCIAL MARKETS, INC.,

*Plaintiffs*,

v.

WILLIAM TONG, in his official capacity as
Attorney General of Connecticut; BRYAN T.
CAFFERELLI, in his official capacity as
Commissioner of the Connecticut Department
of Consumer Protection; and KRISTOFER
GILMAN, in his official capacity as Director of
Gaming for the Connecticut Department of
Consumer Protection,

*Defendants*.

No.  3:25-cv-02121

**ELECTRONICALLY FILED**

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Coinbase Financial Markets, Inc. ("Coinbase"), by and through undersigned counsel, brings this complaint for declaratory and injunctive relief against Defendants William Tong, Bryan T. Cafferelli, and Kristofer Gilman, in their official capacities, alleging as follows:

## INTRODUCTION

1.    Coinbase brings this action to prevent Defendants from unlawfully applying Connecticut gambling laws to federally regulated transactions that are subject to uniform federal law under the exclusive jurisdiction of the Commodity Futures Trading Commission (the "CFTC" or "Commission").  Defendants seek to prohibit companies like Coinbase from offering Connecticut customers access to event contracts—a type of derivative instrument extensively regulated by federal law that can be traded only on federally registered exchanges in transactions facilitated by federally registered intermediaries.  The CFTC's exclusive jurisdiction and that comprehensive federal regulatory framework leave no room for Defendants to graft on Connecticut law to expose Coinbase to grave civil and criminal liability for facilitating federally regulated transactions.  Simply put, Connecticut law is squarely preempted as applied to sports event contracts traded on federally regulated exchanges.  But absent this Court's intervention, Coinbase will suffer multiple species of immediate and irreparable harm from Defendants' attempts to intrude on this federal sphere. Declaratory and injunctive relief is warranted.

2.    Coinbase, Inc., though its affiliates like Coinbase Financial Markets, is a pioneer in the cryptocurrency industry and has focused on updating the financial system for its users while complying with all relevant federal and state laws.  For that reason, it has led the industry in advocating for responsible rules and calling for clarity on critical regulatory questions, carefully safeguarding the company's reputation as a trustworthy financial platform focused on creating economic freedom in the United States and around the world.

3.      Beginning in January 2026, Coinbase will offer event-contract trading to its customers throughout the United States, including in Connecticut.  Event contracts are derivative instruments that enable parties to trade on their predictions about whether a future event—which may relate to economics, or elections, or climate, or sports, or anything else of potential commercial consequence—will occur.  Because these event contracts are paradigmatic "swaps" as defined by the Commodity Exchange Act ("CEA" or "the Act"), they can only be traded on federally regulated exchanges that are subject to the exclusive jurisdiction of the CFTC.

4.      The event contracts that Coinbase intends to offer fully comply with the comprehensive framework of federal laws and regulations that govern derivative trading on federal exchanges.  Indeed, event-contract markets have flourished under the CFTC's supervision.[1]  These markets have grown into a multi-billion-dollar industry as investors, market participants, and the public at large have found these contracts to be an enormously valuable tool for generating information about the likelihood of a future event taking place and hedging risks.  Businesses like Coinbase's have also invested considerable resources to ensure they comply with federal law.  Billions of dollars in transaction volume have already been traded on event-contract exchanges in the United States in 2025 alone.

5.      To make event contracts available to its millions of users, Coinbase entered into an agreement with KalshiEX, LLC ("Kalshi") that will enable Coinbase customers to use Coinbase's platform as an access point to trade event contracts listed on Kalshi's exchange.  Kalshi has been a CFTC-registered Designated Contract Market ("DCM") since November 3, 2020.  Kalshi began listing sports event contracts in January 2025, after complying with all applicable requirements under federal

---

[1] The New York Mercantile Exchange reports a trading volume of more than a million contracts per day, *see* Futures Industry Assoc., *Trends in ETD Trading: Annual Review – 2023* (Jan. 31, 2024), https://tinyurl.com/yha742zs; the average daily futures turnover globally surpasses $12.83 *trillion, see* Rena S. Miller, Cong. Rsch. Serv., R48451, Introduction to Derivatives and the Commodity Futures Trading Commission (2025), https://www.congress.gov/crs-product/R48451.

law. *See* Ex. F. Coinbase Financial Markets, Inc. is a CFTC-registered Futures Commission Merchant ("FCM"), and it serves as an intermediary for customers trading regulated derivatives listed on a DCM, including event contracts on Kalshi.

6.      Coinbase, Kalshi, and the event contracts themselves are all closely regulated by the CFTC. The CEA grants the CFTC "exclusive jurisdiction" over commodity derivatives—including event contracts—that are traded on federally registered derivatives exchanges. *See* 7 U.S.C. § 2(a)(1)(A). And pursuant to its exclusive jurisdiction, the CFTC has constructed and enforced a comprehensive regulatory regime governing both the exchanges (DCMs) that list derivatives—such as Kalshi—and the intermediaries (FCMs) that facilitate customer access to those derivatives exchanges—like Coinbase.

7.      Despite the CFTC's exclusive jurisdiction over the event contracts that Coinbase will make available to its Connecticut customers, Coinbase expects Defendants to imminently bring an enforcement action against it on the grounds that the company is engaged in unlawful "sports wagering" or "unlicensed online gambling" under the Connecticut General Statutes and the Connecticut Unfair Trade Practices Act because Coinbase will facilitate trading in sports-related event contracts listed by Kalshi. Ex. B at 1. Defendants have consistently and repeatedly made clear that they believe sports-related event contracts listed on a CFTC-registered exchange may be offered and sold only by firms that have obtained a license from the Connecticut Department of Consumer Protection, and that the State will enforce its gambling laws to impose civil and criminal liability on companies offering and selling such contracts without a Connecticut license. Exs. B, C, D.

8.      Specifically, the State has issued multiple cease-and-desist letters to companies such as Kalshi, Coinbase's DCM partner, and Robinhood, a company that is similarly situated to Coinbase as an FCM that offers access to Kalshi's event contracts through a partnership with Kalshi. *See, e.g.*, Ex. C. These identical cease-and-desist letters—sent to Kalshi, Robinhood, and Crypto.com—claim these

platforms are "conducting unlicensed online gambling, more specifically sports wagering . . . through its online sports event contracts" and that "[f]ailure to comply may result in additional action" including civil and criminal penalties. *E.g.*, Ex. B at 1–2. These cease-and-desist letters followed Connecticut's investigation into prediction market platforms that the State "suspected of operating in violation of Connecticut law." Ex. E at 1.

9.    Connecticut's threatened enforcement of its state laws is preempted several times over. The CEA's grant of "exclusive jurisdiction" to the CFTC over event contracts traded on DCMs forecloses any state claims. And pursuant to the CEA's mandate, the CFTC has constructed a comprehensive regulatory regime to oversee both event-contract trading and the entities that facilitate these transactions. Permitting States like Connecticut to encroach on the CFTC's jurisdiction would frustrate Congress's efforts to guarantee nationwide uniformity in the futures market by subjecting companies like Coinbase to state laws that are fundamentally inconsistent with federal law requirements. Federal law leaves no room for concurrent state regulation in this field.

10.    Coinbase thus seeks declaratory and injunctive relief under the Declaratory Judgment Act and the Federal Constitution. *See* 28 U.S.C. §§ 1651, 2201, 2202. Federal law directly preempts the Connecticut laws that Defendants have invoked as justifications for regulating and targeting event-contract transactions in Connecticut. But given the State's mistaken view, Coinbase must either risk exposing the company to significant civil (and potentially even criminal) liability or refrain from offering access to event contracts in Connecticut. "The dilemma posed by that coercion—putting the challenger to the choice between abandoning his rights or risking prosecution—is 'a dilemma that it was the very purpose of the Declaratory Judgment Act to ameliorate.'" *MedImmune, Inc.* v. *Genentech, Inc.*, 549 U.S. 118, 127 (2007) (citation omitted).

11.    And without this Court's prompt intervention, Coinbase will necessarily incur irreparable harm from Connecticut's threatened intrusion into the CFTC's domain. If, on the one

hand, Coinbase goes ahead and offers Connecticut users access to event contracts despite Connecticut's threats, the harm to Coinbase would not be limited to the potential for liability itself. Connecticut's enforcement actions, premised on the theory that Coinbase is violating state law notwithstanding Coinbase's full compliance with federal law, would immediately undermine Coinbase's hard-earned reputation as a leader in this space and as a public company that values compliance and follows applicable laws. The risk of such sanctions constitutes a here-and-now injury for Coinbase. It casts a cloud of uncertainty over the company's platform and threatens to disrupt the company's relationships with millions of customers who have relied on Coinbase, Inc. and its affiliates to facilitate nearly $1 trillion in trading volume every year across multiple products and who collectively have custodied more than $500 billion in digital assets.

12. On the other hand, if Coinbase instead refrains from offering Connecticut users access to event contracts because of Connecticut's demand that companies like Coinbase comply with preempted Connecticut state law, Coinbase will be forced to forgo a critical part of its business plan, disrupt its partnership with Kalshi, and abandon a market for a product that the company invested substantial resources in developing—in full compliance with federal law. Coinbase will lose market share and risk spoiling the goodwill of its customers, who use Coinbase's platform precisely because they trust Coinbase as a one-stop shop for their investment and trading needs. And because of Connecticut's sovereign immunity, Coinbase could never be compensated for that lost revenue and business harm, no matter how meritless the State's legal position.

13. These irreparable harms independently—and all the more so collectively—warrant equitable relief. And Coinbase also satisfies the other factors for seeking a preliminary injunction; both the balance of the equities and the public interest militate in favor of prompt injunctive and declaratory relief.

14.    Because the specter of Connecticut enforcement is imminent and existential to Coinbase's event-contract operations in Connecticut, Coinbase respectfully seeks expedited consideration of its request for a preliminary junction.

## PARTIES

15.    Plaintiff Coinbase Financial Markets, Inc is incorporated in Delaware, and its principal place of business is New York, New York.  It has been registered with the CFTC and National Futures Association as a Futures Commission Merchant since August 16, 2023.

16.    Defendant William Tong is sued in his official capacity as Attorney General of Connecticut.

17.    Defendant Bryan T. Cafferelli is sued in his official capacity as Commissioner of the Connecticut Department of Consumer Protection.

18.    Defendant Kristofer Gilman is sued in his official capacity as the Director of Gaming for the Connecticut Department of Consumer Protection.

19.    Together, defendants William Tong, Bryan T. Cafferelli, and Kristofer Gilman would be responsible for enforcing any demand that Coinbase comply with preempted Connecticut law.

## JURISDICTION AND VENUE

20.    This Court has subject-matter jurisdiction over Coinbase's claim pursuant to 28 U.S.C. § 1331.  This action presents a federal question under the laws and Constitution of the United States because it concerns whether the Commodity Exchange Act, 7 U.S.C. §§ 1 *et seq.*, preempts Connecticut's gambling laws insofar as they purport to regulate trades on a CFTC-designated contract market.

21.    The Court can award injunctive relief under 28 U.S.C. § 1651, and it can award declaratory and other appropriate relief under 28 U.S.C. §§ 2201 and 2202.  The Eleventh Amendment does not bar this Court from exercising jurisdiction in this suit for prospective declaratory and

injunctive relief against state officials. "[A] state official . . . is not the State for sovereign-immunity purposes." *Va. Office for Prot. and Advocac.* v. *Stewart*, 563 U.S. 247, 255 (2011). Where, as here, a plaintiff seeks to enjoin a state official from enforcing state laws in violation of federal law, injunctive relief is available. *See Verizon Md., Inc.* v. *Pub. Serv. Comm'n*, 535 U.S. 635, 645-46 (2002) (recognizing the availability of an *Ex parte Young* action for injunctive relief against regulatory commissioners).

22.     This Court has personal jurisdiction over the Defendants. The Defendants are domiciled and perform their duties in Connecticut.

23.     Venue is proper under 28 U.S.C. § 1391(b)(1) and (b)(2) because a substantial part of the events giving rise to Coinbase's claims occurred in this District, and Defendants reside within Connecticut.

## FACTUAL ALLEGATIONS

### A.     Event Contracts Provide Valuable Investment Opportunities And Generate Real-Time Data About Consequential Economic, Political, And Commercial Events.

24.     This is a case about derivatives, *i.e.*, financial instruments whose value depends on, or "derives" from, an underlying asset, rate, or variable, known as the underlier. The universe of potential underliers includes "commodities," a term the CEA defines broadly to include virtually anything that can serve as a basis for trade or pricing—from tangible goods like wheat, oil, or gold to intangible variables such as financial indices, interest rates, or the occurrence (or nonoccurrence) of an event associated with financial, commercial, or economic consequences. *See* 7 U.S.C. § 1a(9), (19).

25.     One common type of derivative is a swap. A swap is an agreement in which two parties exchange payments based on the value or performance of an underlying reference—such as an interest rate, commodity price, or real-world contingency. *See Sec. Indus. & Fin. Mkts. Ass'n* v. *CFTC*, 67 F. Supp. 3d 373, 385 (D.D.C. 2014). As particularly relevant here, event contracts are a species of swaps that enable customers to trade on their predictions about whether a future real-world

event will occur. Typically, event contracts are structured as binary, yes-or-no questions where each "yes" position corresponds to an opposing "no" position. When the contract expires, the party who correctly predicted the occurrence or nonoccurrence of the future event receives a payout.

26.    To take one example, an exchange may list an event contract that asks whether the New York Giants will record a win in their next game. Once the defined occurrence has taken place (here, the next game takes place and the Giants record a win), the contract settles accordingly: The side representing the occurrence (*i.e.*, "Giants win") receives the contract payout, while the side representing the nonoccurrence (*i.e.*, "Giants do not win") receives nothing. The event contract settles with one side receiving $1 and the other $0; the specified contingency either occurs or does not occur.

27.    Importantly, parties can sell their positions before the event contract expires. Accordingly, the contract's price will fluctuate based on supply and demand, reflecting the market's real-time views regarding the probability of the underlying future event based on, among other things, new data. Take the New York Giants example. For an event contract worth $1, if the "Giants Win" position is trading at 65 cents, that means that market participants predict there is a 65% chance that the defined occurrence (Giants win) will take place and a corresponding 35% probability that the nonoccurrence (Giants do not win) will occur. But if new information emerges suggesting that a Giants win is more or less likely to occur, the trading price will change. Thus, if the Giants are in the lead going into halftime, the price of the "yes" and "no" positions will likely change. Much like a company's stock price fluctuates based on the market's continual reassessment of the company's value—reflecting the public's perception of information related to the company's profitability and evolving market realities—event contracts likewise reflect the market's up-to-date prediction of the probability that a particular event will transpire.

28.    Like many financial instruments, event contracts can be employed as an investment tool or as a mechanism to mitigate risk for market participants with an offsetting underlying exposure.

For instance, a hotel owner in Tampa may hedge against the risk of reduced tourism by purchasing event contracts that predict a hurricane in Florida during the 2026 hurricane season. Or a Midwestern corn farmer worried about drought conditions could buy event contracts predicting below-average rainfall. Similarly, movie producers in Los Angeles concerned about a poor box-office performance could purchase event contracts that predict a low Rotten Tomatoes rating; if the movie flounders, the event contracts would help offset the studio's revenue shortfall.

29.    At the same time, event contracts provide valuable information to market participants and the general public through their price-discovery dynamics.[2] Event-contract buyers and sellers often take positions after carefully researching and studying the relevant issues, so trades serve as important information-sharing events. And all market participants play a key role in the price-discovery process by supplying liquidity and depth to the market; widespread participation enables hedgers and other traders to enter and exit positions efficiently, which in turn enhances the accuracy of price signals and overall stability of the markets. Consumers can then look at event-contract prices to inform their understandings about how consequential world events will unfold.

30.    For example, event-contract platforms have proven wildly successful when it comes to predicting elections. During the final weeks of the 2024 presidential election, American media companies released polls that showed a slight Vice President Harris lead among likely voters. Prediction markets, on the other hand, showed that President Trump's chances of winning were nearly ten percentage points higher than his competitor's, a prediction that eventually came to fruition.[3] Moreover, political prediction markets provide real-time data that traditional polls and election

---

[2] *See* Friedrich A. Hayek, *The Use of Knowledge in Society*, 35 Am. Econ. Rev. 519, 526 (1945) ("[T]he price system" serves as a "mechanism for communicating information"); Robin Hanson, *Shall We Vote on Values, but Bet on Beliefs?*, 21 J. POL. PHIL. 151 (2013)(arguing that prediction markets are predictively superior to polls and experts).

[3] Sydney Lake, *Harris-Trump Polls Tighten, But PredictIt And Polymarket Tell A Different Story*, Yahoo!    Finance    (Oct.    14,    2024),    https://finance.yahoo.com/news/ harris-trump-polls-tighten-predictit-173916471.html.

analysts often cannot replicate. In the 2025 Democratic primary for the New York City mayoral election, Zohran Mamdani's chances of winning on prediction-market platforms shot from 42% to 68% within just a few minutes of the polls closing.[4]

31.    Given their predictive value and hedging utility, prediction markets have become widespread. Prediction-market platforms have reported billions of dollars in transaction volume and hundreds of millions of dollars in revenue in 2025.[5] And the community of users is rapidly growing.[6] Indeed, in the final months of 2024 alone, millions of people traded more than $3 billion dollars on these markets to predict the winner of the presidential election.[7]

32.    Prediction markets have also emerged as a valuable source of real-time data for both retail and institutional market participants. For example, CNN recently announced that it would feature prediction-market data in its on-air news reporting.[8] And major financial platforms such as Google Finance and Bloomberg now display prediction market prices from CFTC-registered exchanges alongside traditional asset prices from other federally registered exchanges, in a sign of prediction markets' growing role as a unique, continuously updated measure of market expectations

---

[4]    Calder McHugh, *Pollsters Have A New Kind Of Competitor. They Should Be Worried.*, Politico (Oct. 24, 2025), https://www.politico.com/news/magazine/2025/10/24/political-betting-markets-political-predictions-accuracy-00620431.

[5]    *See* Stacy Elliott, *Prediction Markets Hit All-Time High of $2 Billion in Weekly Volume*, Yahoo! Finance (Oct. 20, 2025), https://finance.yahoo.com/news/prediction-markets-hit-time-high-200142742.html; Paul R. La Monica, *Robinhood, Other Trading Firms See Profit in Prediction Markets. Should You Take a Gamble?*, Barron's (Nov. 6, 2025), https://www.barrons.com/articles/robinhood-prediction-markets-polymarket-kalshi-b8541eb4.

[6]    *See* Anna Lyudvig, *Prediction Markets Gain Ground: Navigating Regulation and Innovation*, Traders Magazine (Aug. 22, 2025), https://www.tradersmagazine.com/featured_articles/prediction-markets-gain-ground-navigating-regulation-and-innovation/.

[7]    *See* Jeff John Roberts, *Investors Are Betting Big On 'Prediction Markets' Kalshi And Polymarket—Will The Gamble Pay Off?*, Yahoo! Finance (Sep. 29, 2025), https://finance.yahoo.com/news/investors-betting-big-prediction-markets093000379.html.

[8]    *See* Sara Fischer, *Exclusive: CNN Strikes Prediction Data Partnership with Kalshi*, Axios (Dec. 2, 2025), https://www.axios.com/2025/12/02/cnn-kalshi-prediction-market-data.

and public sentiment.[9]  By "challenging how finance measures truth and probability," prediction markets have become "a growing corner" of the financial industry.[10]

**B.  Congress Grants The CFTC "Exclusive Jurisdiction" Over Derivatives Traded On Federally Registered Exchanges, Including "Swaps."**

33.    The federal government has regulated the derivatives market for over a century. Before 1922, many States and regulators held commodities futures contracts in low regard, viewing such contracts as "gambling in grain," *Cothran* v. *Ellis*, 16 N.E. 646, 647 (Ill. 1888), and "nothing more than a wager," *Irwin* v. *Williar*, 110 U.S. 499, 508-09 (1884).  Accordingly, States sought to prohibit— or at least restrict—their use.  But the value of these derivatives as a "means of avoiding or mitigating catastrophes, equalizing prices, and providing for periods of want" became better appreciated over time, as derivative markets developed and matured.  *Bd. of Trade of City of Chi.* v. *Christie Grain & Stock Co.*, 198 U.S. 236, 247(1905).

34.    Thus, Congress passed the Grain Futures Act in 1922 to centralize futures trading on federally approved "contract market[s]."  Grain Futures Act, ch. 369, 42 Stat. 998, 1000-02 (1922). And 14 years later, Congress enacted the CEA, which expanded federal oversight over derivatives exchanges.  Commodity Exchange Act, Pub. L. No. 74-675, 49 Stat. 1491 (1936).

35.    Critically, the original CEA expressly preserved "any State law applicable" to "transaction[s]" regulated by the Act.  *Id.* at 1494.  But in 1974, Congress established a federal agency, the CFTC, to oversee the Act's regulatory framework, charging the CTFC with regulating registered derivatives exchanges and "promo[ting] the integrity, resilience, and vibrancy of the U.S. derivatives

---

[9]  *See* Denitsa Tsekova, *Google to Offer Kalshi and Polymarket Data on Finance Searches*, Bloomberg (Nov. 6, 2025), https://www.bloomberg.com/news/articles/2025-11-06/google-to-offer-kalshi-and-polymarket-data-on-finance-searches; Samuel Haig, *Bloomberg Terminal Integrates Polymarket Election Data*, The Defiant (Sep. 4, 2024), https://thedefiant.io/news/defi/bloomberg-terminal-integrates-polymarket-election-data.

[10] Charles-Henry Monchau, *Betting on Future Events: The Rise of Prediction Markets*, Investing.com (Nov. 7, 2025), https://www.investing.com/analysis/betting-on-future-events-the-rise-of-prediction-markets-200669613.

markets."[11]  And this time, with the benefit of hindsight, Congress granted the CFTC "exclusive jurisdiction" over transactions involving derivatives instruments that are listed and traded on federally registered exchanges.  7 U.S.C. § 2(a)(1)(A).

36.     In amending the Act to establish the CFTC, Congress sought to centralize authority over regulated derivatives markets in the federal government and ensure nationwide uniformity in those markets.  The Act's drafting history makes that plain.  Specifically, in establishing the CFTC and conferring on the CFTC "exclusive jurisdiction" over transactions regulated by the Act, Congress also eliminated the existing provision of the CEA that preserved "any State law applicable" to futures trading.  *See* H.R. Rep. No. 93-1383, at 35; *see also* 120 Cong. Rec. 30,464 (1974) (statement of Sen. Curtis) (proposing the deletion "[i]n order to assure that Federal preemption is complete").  And when the House proposed a provision that would allow state law to apply to CEA-regulated transactions, the Senate agreed to its inclusion only after amending the provision to clarify that it applied "[e]xcept as *hereinabove provided*" in the grant of exclusive jurisdiction to the CFTC.  *See* 7 U.S.C. § 2(a)(1)(A) (emphasis added); S. Rep. No. 93-1131, at 31 (1974).

37.     The 1974 amendments to the CEA reflected Congress's concerns that the regulation of derivatives exchanges under "different State laws would just lead to total chaos." *Commodity Futures Trading Comm'n Act: Hearings Before the S. Comm. on Agriculture & Forestry on S. 2485, S. 2578, S. 2837, and H.R. 13113*, 93d Cong. 685 (1974) (statement of Sen. Clark); *see also Review of Commodity Exch. Act and Discussion of Possible Changes, Hearings Before the H. Comm. on Ag.*, 93d Cong. 10 (1973) (statement of Rep. Smith) (advocating that "trading in all futures should be under Federal regulation").  Congress thus created a federal regulatory regime in which there would be no "need for any supplementary regulation by the States"; instead, "[u]nder the exclusive grant of jurisdiction to the Commission, the

---

[11] *The Commission*, CFTC, https://www.cftc.gov/About/AboutTheCommission.

authority in the Commodity Exchange Act . . . would preempt the field insofar as futures regulation is concerned." S. Rep. No. 93-1194, at 35-36 (1974).

38.     As part of the 1974 amendments, Congress also expanded the CEA's definition of "commodity" to include "all other goods and articles . . . and all services, rights, and interests . . . in which contracts for future delivery are presently to in the future dealt in." 7 U.S.C. § 1a(9). That amendment extended the CFTC's jurisdiction to reach all "futures trading that might now exist or might develop in the future." H.R. Rep. No. 93-975, at 79 (1974); *see Effex Cap., LLC* v. *Nat'l Futures Ass'n*, 933 F.3d 882, 894 (7th Cir. 2019) (the "history of the [1974 amendments]" shows that Congress "fear[ed]" that "states would regulate the futures markets to a chaotic effect" "without increased federal regulation").

39.     In 2010, Congress again amended the CEA and broadened the CFTC's exclusive jurisdiction over derivatives traded on federally registered exchanges to specifically cover "swaps." In pertinent part, the Act grants the CFTC "*exclusive jurisdiction . . . with respect to . . . transactions involving swaps* or contracts of sale of a commodity for future delivery . . . *traded or executed on a contract market designated* pursuant to section 7 of this title." 7 U.S.C. § 2(a)(1)(A) (emphasis added); *see* Barry Taylor-Brill, *Cracking the Preemption Code: The New Model for OTC Derivatives*, 13 Va. L. & Bus. Rev. 1, 13 (2019) (noting that the 2010 amendment gave the CFTC an "explicit congressional mandate to carry out regulation of the swap markets under federal law free from potential state interference").[12] Congress expansively defined the term "swap" to include, among other things, any "agreement, contract, or

---

[12] The CEA's grant of exclusive jurisdiction to the CFTC contains limited carveouts. The first preserves the independent jurisdiction of the SEC and other federal agencies over instruments within their statutory mandates (for example, the SEC retains authority over security-based swaps). *See* 7 U.S.C. § 2(a)(1); 15 U.S.C. §§ 77b(a)(1), 78c(a)(10). The second provides a narrow grant of authority to States to enforce generally applicable laws against *off*-exchange transactions—*i.e.*, those not conducted on a DCM—or against *un*registered entities. 7 U.S.C. § 16(e)(1). Neither exception applies to the event contracts that Coinbase will make available to its customers because those products are traded exclusively on a CFTC-registered contract market and do not fall within the portfolio of another federal agency.

transaction" that "provides for any purchase, sale, payment, or delivery . . . dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii).

40.    As courts have emphasized, "the definition of a 'swap' in the CEA is broad"; indeed, Congress expressly extended the definition to cover "yet unknown 'agreement[s], contract[s], or transaction[s] that [are], or in the future become[], commonly known to the trade as a swap.'" *United States* v. *Phillips*, 690 F. Supp. 3d 268, 286 (S.D.N.Y. 2023) (quoting 7 U.S.C. § 1a(47)(A)(iv)).    In defining the term "swap" expansively, Congress sought to prevent regulated entities from "'gam[ing] the system' by labeling or structuring transactions that are swaps" to appear outside the CEA's reach. 156 Cong. Rec. S5924(daily ed. July 15, 2010) (statement of Sen. Lincoln).[13]

**C.    Because Event Contracts Are "Swaps," The Entities That Offer Event Contracts For Public Trading Must Comply With The Comprehensive Regulatory Framework Established By The CEA And CFTC.**

41.    As the CFTC has consistently recognized, event contracts are "swaps," subject to the CFTC's exclusive jurisdiction.[14]    That is because event contracts are binary contracts that pay out

---

[13] In scoping the bounds of the CEA's "swap" definition, the CFTC has long recognized that a product's classification as a swap turns on its transactional and structural characteristics along with how market participants are historically regulated rather than the subject matter underlying the transaction. *See* Further Definition of "Swap," "Sec.-Based Swap," and "Sec.-Based Swap Agreement; Mixed Swaps; Sec.-Based Swap Agreement Recordkeeping, 77 Fed. Reg. 48208, 48211, 48246 (Aug. 13, 2012) (recognizing that the CEA's "swap" definition could be read in an overly broad manner so as to improperly "include certain types of agreements, contracts, and transactions that have not [historically] been considered swaps" such as "agreements to purchase home heating fuel" or "insurance products"). Under that approach, the CFTC concluded, for instance, that certain insurance products were not covered by the CEA's definition of a swap because nothing in the CEA indicates that Congress intended for those products, which were historically regulated under state law, to be regulated as swaps. *Id.* at 48212-48220.

[14] *See, e.g.*, *In re Trade Exchange Network*, CFTC No. 05-14, 1 (Sep. 29, 2005) (entering a consent order against defendant who solicited and accepted orders from U.S. residents for binary options, structured similarly to modern event contracts); *Concept Release on Regulatory Treatment of Event Contracts,* 73 Fed. Reg. 25669, 25670 (May 7, 2008) ("A significant number of event contracts are structured as all-or-nothing binary transactions commonly described as binary options"); *In re Blockratize (d/b/a Polymarket.com)*, CFTC No. 22-09, 2, 5 (Jan. 3, 2022) ("Polymarket is an online trading platform that offers binary options in the form of winner-take-all 'event contracts' … Binary options are swaps as

depending on the "occurrence [or] nonoccurrence" of a future "event or contingency."[15]  7 U.S.C. § 1a(47)(A)(ii).  And the underlying event is "associated with a potential financial, economic, or commercial consequence."  *Id.*  For example, the Giants winning (or losing) their next game has a clear economic and commercial consequence for stadium vendors, local communities, and team sponsors.  Similarly, whether a hurricane bombards Florida's Gulf Coast bears obvious financial implications for hotel owners and the entire Tampa economy.

42.    Sporting event contracts of the sort that Coinbase will offer fall comfortably within the CEA's definition of a "swap" because those contracts plainly track events with significant, predictable, and measurable economic ramifications.  Whether a team makes the NCAA Tournament, for example, can make all the difference for a college town's economy.[16]  UConn's basketball program alone generates over $10 million in out-of-state visitor spending, and successful basketball seasons keep many retail stores, restaurants, and hotels in the area afloat for the whole year.[17]  Product sponsors

---

defined under Section 1(a)(47) of the Act."); *Clarke* v. *CFTC*, 74 F.4th 627, 633-634 (5th Cir. 2023) (CFTC staff have permitted PredictIt to operate a "futures market for politics" under a no-action letter issued in 2014); Appellant CFTC's Brief at 12 & n.11, *KalshiEX, LLC* v. *CFTC*, 119 F.4th 58 (D.C. Cir. 2024) (No. 24-5205) ("Kalshi's event contracts are a form of options, typically known as binary options. . . . [T]hese particular binary options fall within the definition of a swap.").

[15] Depending on how a particular event contract is structured, it could also fall within other prongs of the CEA's "swap" definition. *See* 7 U.S.C. § 1a(47)(A).  For example, a contract referencing whether the New York Giants will win their next game could also be structured as a binary option that pays out based on whether the team's total points exceed those of its opponent.  In that case, the contract could be a swap under the first prong of the "swap" definition, which covers "any agreement, contract, or transaction" that is an "option of any kind" based on the value of one or more "quantitative measures." *Id.*  Similarly, the CFTC has also recognized that event contracts may be structured as futures contracts.  Concept Release on the Appropriate Regulatory Treatment of Event Contracts, 73 Fed. Reg. 25669, 25670 (May 7, 2008).  In all events, the CEA's preemptive force would remain the same:  Section 2(a)(1) confers exclusive jurisdiction on the CFTC over swaps, commodity options, and futures contracts traded or executed on DCMs.  7 U.S.C. § 2(a)(1).

[16] *See* Ebong Udoma, *CT Leans on March Madness to Launch a $1.8 Million Tourism Campaign*, WSHU (Mar. 28, 2024), https://www.wshu.org/connecticut-news/2024-03-28/ct-tourism-uconn-march-madness (reporting that Connecticut planned its tourism campaign to "take[] advantage of UConn's national prominence during March Madness").

[17] *See* Theophilus Djaba, *Economic Impact of the University of Connecticut's Division of Athletics* 7 (January 2025), https://impact.uconn.edu/athletics-impact/.

pay tens of millions of dollars for college athletes to tout their products to a national audience.[18]  For these parties, and others, UConn's prospects of athletic success can have huge economic consequences.  Likewise, when Major League Baseball decided to move its All-Star game from Atlanta in 2021, some analysts estimated that the relocation would cost the local economy more than $100 million in "lost economic impact."[19]

43.     And the success of sporting events and team franchises directly impacts a broad and ever-expanding range of major financial institutions and investors.  Earlier this year, the National Football League voted to allow private equity ownership of its teams, and the Miami Dolphins, Buffalo Bills, and Los Angeles Chargers have already accepted such investment.[20]  Those private equity investors raise money from a range of other investors, including pensions funds, college endowments, and hedge funds, among others.  The Arizona Public Safety Personnel Retirement System is one of the largest investors in a British soccer team, Ipswich Town FC.[21]  College sports conferences have signed multi-year broadcasting contracts with media companies; those contracts are worth billions of

---

[18] Daniel Chavkin, *College Football's 30 Highest-Paid Players in 2025*, Sept. 19, 2025, https://www.sportingnews.com/us/ncaa-football/news/highest-paid-college-football-players/c95bc5fa92d7075631bbeb14.

[19] Natasha Chen, Melissa Alonso & Alla Elassar, *MLB's Decision to Move Its All-Star Game From Georgia Will Have a $100 Million Impact on the State*, (Apr. 3, 2021), https://www.cnn.com/2021/04/03/us/mlb-all-star-game-relocation-lost-money-economic-impact.

[20] *See Miami Dolphins Announce Sale of Limited Interest to Ares Management*, Miami Dolphins (Dec. 11, 2024), https://www.miamidolphins.com/news/miami-dolphins-announce-sale-of-limited-interest-to-ares-management; *Buffalo Bills Welcome 10 New Limited Partners to Ownership Group*, Buffalo Bills (Dec. 11, 2024), https://www.buffalobills.com/news/buffalo-bills-welcome-10-new-limited-partners-to-ownership-group; *NFL Approves Arctos as Los Angeles Chargers Limited Partner*, Los Angeles Chargers (May 20, 2025), https://www.chargers.com/news/nfl-approves-arctos-as-los-angeles-chargers-limited-partner.

[21] David Hellier, *Arizona Pension Fund to Bank Profit After English Football Deal*, Bloomberg (July 25, 2025), https://www.bloomberg.com/news/articles/2025-07-25/arizona-pension-fund-to-bank-profit-after-english-football-deal.

dollars to their investors and will undoubtedly be impacted by the relative popularity and success of the teams in those conferences.[22]

44.     Instruments with this structure have long been recognized by courts, the CFTC, and market participants as standard forms of swaps.  For example, one-touch or "digital" options on major currency pairs or commodities pay a fixed amount if a specified condition occurs—such as the euro-dollar exchange rate exceeding a threshold or oil prices closing above a specified strike price.  *See, e.g.,* *Phillips*, 690 F. Supp. 3d at 285 (holding that one-touch or "barrier" options on the USD/ZAR exchange rate are swaps).  Event contracts, too, provide for payment upon the occurrence or nonoccurrence of a defined condition.  7 U.S.C. § 1a(47)(A)(iv).[23]  And event contracts, too, are swaps subject to the CFTC's exclusive jurisdiction.[24]

45.     Indeed, Congress enacted a special rule to govern CFTC review and approval of "event contracts."  *See* Dodd-Frank Wall St. Reform & Consumer Protection Act Pub. L. No. 111-203, 124 Stat. 1376 (2010).  As further detailed below, event contracts that comply with the relevant statutory requirements can be "listed" for "trading" on federally registered exchanges.  7 U.S.C. § 7a-2(c)(5)(C)(i)-(ii).  That Congress expressly vested the CFTC with authority to review and approve "event contracts" underscores that these instruments are "swaps" falling within the CFTC's "exclusive jurisdiction," as the "swap" definition itself makes clear.  *See* 7 U.S.C. § 1(a)(47)(A).

---

[22] Michael Johnson, *Top Conferences Lead Changing College Sports Dynamics*, S&P Global (Oct. 30, 2025), https://www.spglobal.com/market-intelligence/en/news-insights/research/2025/10/top-conferences-lead-changing-college-sports-dynamics.

[23] *See, e.g.*, CME Group, *CFTC Regulation 40.2(a) Certification.  Initial Listing of Event Contract Swaps on Pro Basketball Games, Pro Football Season Championship, and College Football Games*, CME Submission No. 25-466 (Nov. 19, 2025), https://www.cftc.gov/sites/default/files/filings/ptc/25/11/ptc1192532737.pdf.

[24] *See* Braeden Anderson, *The Tricky Issues Underscoring Prediction Market Regulation*, Law360 (Dec. 15, 2025), https://www.law360.com/articles/2420739/the-tricky-issues-underscoring-prediction-market-regulation.

46.     To offer event contracts (like other derivatives) for public trading, exchanges must be designated by the CFTC as a contract market and comply with the Commission's extensive regulations governing the buying and selling of derivatives.  To be designated under Section 7 of the CEA as a DCM, an exchange must demonstrate its ability to comply with the CFTC's comprehensive regulatory regime, which includes a list of 23 "Core Principles."  *See* 7 U.S.C. §§ 2(e), 7(a); *see also* 17 C.F.R. 38.3(a)(2).  An exchange's status as a "[designated] contract market imposes upon it a duty of self-regulation, subject to the Commission's oversight," such as "enact[ing] and enforc[ing] rules to ensure fair and orderly trading." *Am. Agric. Movement, Inc.* v. *Bd. of Trade*, 977 F.2d 1147, 1150–51 (7th Cir. 1992), *abrogated on other grounds by Time Warner Cable* v. *Doyle*, 66 F.3d 867(7th Cir. 1995).  And if a DCM fails to fulfill its ongoing responsibility to comply with the relevant regulations, the CFTC may suspend or revoke the exchange's official designation.  7 U.S.C. § 8(b).

47.     Similarly rigorous regulations apply to FCMs, the intermediaries like Coinbase that facilitate customer access to derivatives traded on DCMs.  As with DCMs, FCMs must register with the CFTC and adhere to comprehensive statutory and regulatory requirements, including reporting rules, public disclosure obligations, financial requirements, and recordkeeping demands.  *See* 17 C.F.R. 1.10(b), 1.10(d), 1.12, 1.14, 1.17, 1.18, 1.55, 17.00.  FCMs must further "establish, maintain, and enforce a system of risk management policies and procedures designed to monitor and manage the risks associated with" the FCM's activities.  17 C.F.R. 1.11(c), (e).  CFTC regulations also mandate that FCMs "adopt and implement written policies and procedures" to ensure compliance with CFTC conflict-of-interest rules and "establish and enforce internal rules, procedures and controls" relating to certain trading standards.  17 C.F.R. 1.71(b)(1), 155.3(a).  An FCM that does not comply with these and other requirements "must transfer all customer accounts and immediately cease doing business as a futures commission merchant until such time as the firm is able to demonstrate such compliance." 17 C.F.R. 1.17(a)(4).

48.     The CFTC—along with the U.S. Department of Justice—enforces the CEA's requirements and monitors commodity derivatives offered and sold on DCMs.  If a DCM or FCM violates applicable CEA requirements or implementing regulations, the CFTC, which is charged with safeguarding the integrity of these markets, may initiate an investigation, pursue an enforcement action in administrative proceedings, or sue in federal court.  CFTC, Div. of Enf't, Enf't Manual § 3.3 (2020).  The CFTC may also pursue a variety of sanctions, including civil monetary penalties; injunctive relief; cease-and-desist orders; restitution; disgorgement; or "the suspension, denial, revocation, or restriction of registration and trading privileges."  *Id.*  And if the Commission discovers evidence of potential criminal violations, it may refer the matter to the Department of Justice or appropriate state authority for prosecution.  *Id.*

49.     Exchanges must also comply with federal law and regulations when listing event contracts.  *See* 17 C.F.R. 38.4, 40.2.  To list event contracts on a DCM, exchanges may either submit the new contracts to the CFTC for approval before listing or self-certify that the contracts comply with the Commission's requirements.  7 U.S.C. § 7a-2(c)(1), (4)(A); 17 C.F.R. 40.2(a), 40.3(a), 40.11(c).  The CFTC "shall approve a new contract . . . unless the Commission finds that the new contract . . . would violate" the CEA or CFTC regulations.  7 U.S.C. § 7a-2(c)(5)(B).  Certification does not allow a DCM to evade the CFTC's supervision:  The CFTC has a 10-day window to "stay[] the certification" for additional review.  *Id.* § 7a-2(c)(3).  If the Commission does not act within this period, the new contract is deemed approved and "shall become effective."  *Id.* § 7a-2(c)(2).

50.     Granted, when Congress created this regime, it understood that certain event contracts may warrant particular attention, such as those that "involve" "activity that is unlawful under any Federal or State law," "terrorism," "assassination," "war," or "gaming."  *See* 7 U.S.C. § 7a-2(c)(5)(C)(i)-(ii); *see also* 156 Cong. Rec. S5906-07 (daily ed. July 15, 2010) (statements of Sens. Lincoln and Feinstein).  But rather than employ the blunt hammer of blanket prohibition, Congress provided the

CFTC with the scalpel of case-by-case review.  Under the 2010 Special Rule, *supra* ¶ 45, the CFTC has discretion to review and prohibit specific event contracts that fall within these enumerated categories, including those that involve "gaming," if the CFTC determines that the contract is "contrary to the public interest."  7 U.S.C.  § 7a-2(c)(5)(C)(i).  Unless the CFTC so determines, however, such event contracts can be "listed" for "trading" on federally registered exchanges.  *Id.*; *see* 17 C.F.R. 40.11(a)(1)-(2).  But even as these markets have matured into a multi-billion-dollar industry, the CFTC has never prohibited an event contract by Kalshi on the grounds that it involves gaming or is contrary to the public interest.[25]

### D.    Coinbase Partners With Kalshi To Offer Event Contracts On Coinbase's Platform.

51.    As noted above, Kalshi is a CFTC-registered DCM that lists swaps, including event contracts, for trading.  Contracts traded on Kalshi's exchange involve events that run the gamut from politics to climate to public health.  Listed contracts include whether the United States will experience a recession next year; whether Los Angeles will suffer another string of wildfires; whether India will achieve its 2030 climate goals; and whether the market share for electric vehicles will exceed 50% in 2030.

52.    Kalshi also offers sports-related event contracts.  Kalshi began listing its sports event contracts in January 2025, after certifying that the contracts complied with applicable requirements under the CEA.  *See supra* pp. ¶ 5.  When the CFTC declined to invoke its authority to conduct a "public interest" review of those contracts, the contracts were deemed approved by the CFTC and permitted to be traded on Kalshi's exchange under federal law.

---

[25] In 2023, the CFTC issued an order prohibiting Kalshi from listing election-related event contracts on the ground that such contracts involve "gaming" and "unlawful" activity.  But a federal district court vacated this order after concluding that such contracts did not "involve" either enumerated category, *see KalshiEX LLC* v. *CFTC*, 2024 WL 4164694, at *7-*13 (D.D.C. Sept. 12, 2024), and the CFTC subsequently moved for dismissal of its appeal, *see* 2025 WL 1349979 (D.C. Cir. May 7, 2025).

53.    On December 17, 2025, Coinbase announced that it would begin offering its customers the ability to trade event contracts on Coinbase's platform through a partnership with Kalshi.  This partnership will give Coinbase's customers access to the array of contracts listed on Kalshi's exchange while using Coinbase's simple, familiar, and user-friendly interface.  Coinbase customers will place orders for event-contract trades through their Coinbase accounts, and the trades will be executed on Kalshi's CFTC-designated exchange and settled through Kalshi's CFTC-registered clearinghouse.  And by virtue of using Coinbase's trusted platform, users can be confident they are trading on a secure and compliant platform.  They can likewise rely on Coinbase to perform the core functions of an FCM—*i.e.*, to hold customer funds in segregated accounts, to reconcile positions and trade data, and to provide customers with daily statements and regulatory reporting.

### E.    Connecticut Warns Federally Registered Exchanges That Connecticut Law Prohibits Them From Offering Sports-Related Event Contracts In Connecticut, On Penalty Of Civil And Criminal Liability.

54.    Connecticut has made clear that Coinbase risks incurring civil and criminal liability once it begins offering sports-related event contracts to its customers who live in Connecticut.  Connecticut recently threatened Coinbase's peers—including Kalshi, Coinbase's partner in offering these event contracts, and Robinhood, an FCM that, like Coinbase, is partnering with Kalshi to provide users access to these contracts—with criminal and civil liability for offering sports-related event contracts on their platforms.

55.    Specifically, the Connecticut Department of Consumer Protection sent Kalshi, Robinhood, and Crypto.com identical cease-and-desist letters on December 2, 2025, alleging that by offering sports-related event contracts, Kalshi, Robinhood, and Crypto.com are "conducting unlicensed online gambling, more specifically sports wagering" without a license from the Connecticut Department of Consumer Protection, in violation of Connecticut General Statutes, Conn. Gen. Stat. §§ 53-278b, 53-278d, and the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. §§ 42-110 *et*

*seq. See, e.g.*, Ex. B at 1.  In support of this accusation, the Gaming Director contended that sports

event contracts "constitute sports wagering because they allow Connecticut residents to risk

something of value for gain by an electronic wagering platform through the placement of wagers on

the outcome of live sporting events or portions of a live sporting event." *Id.* The State further asserted

that prediction markets are engaged in unfair trade practices designed "to gain a competitive advantage

over appropriately licensed entities" by promoting "unlicensed and illegal gambling services." *Id.* at

2.

    56.    In addition to alleging that sports event contracts are void under Connecticut law, the

State threatened prediction markets with civil and criminal penalties.  *Id.*  Under the Connecticut

General Statutes, any party that "solicits or induces another to engage in gambling"—which is defined

as "risking any money . . . for gain contingent in whole or in part upon . . . chance," Conn. Gen. Stat.

§ 53-278a(2) (2025)—is guilty of a class B misdemeanor.  *Id.* § 53-278b(a).  The offense is elevated to

a class A misdemeanor if the party "accept[s] or offer[s] to accept, for profit, money . . . risked in

gambling." *Id.* §§ 53-278a(3), 53-278b(b).

    57.    Connecticut's cease-and-desist letters came after several months of threatened

enforcement activity.   In April 2025, the Department of Consumer Protection broadcasted its

investigation into prediction markets, which the State "suspected of operating in violation of

Connecticut law." Ex. E at 1.  And Connecticut reiterated this position in an amicus brief filed this

year in the Third Circuit where the New Jersey gambling regulator is seeking to enforce New Jersey's

gambling laws against Kalshi.  To support the States' contention that event contracts are subject to

state regulation, the amicus brief asserted that "the activity [prediction markets] facilitate[] is obviously

sports betting," which "forms a part of the States' traditional police powers."  Brief of *Amici Curiae* of

Nevada, Ohio, 32 Other States, District of Columbia, and Northern Mariana Islands Supporting

Appellants at 4, 14, *KalshiEX LLC* v. *Flaherty*, No. 24-cv-4037 (3rd Cir. June 17, 2025). According to the States, any "counter position strains credulity." *Id.* at 14.

## CLAIMS FOR RELIEF

### COUNT I
### United States Constitution
### (Supremacy Clause – Preemption by Commodity Exchange Act)
U.S. Const. art. VI, cl. 2.

58.     Coinbase repeats and incorporates by reference all the allegations set forth above.

59.     Under the Supremacy Clause, "state laws that interfere with, or are contrary to the laws of congress . . . are invalid." *Wisconsin Pub. Intervenor* v. *Mortier*, 501 U.S. 597, 604 (1991) (internal quotation marks and citation omitted). That is because, in our constitutional system, "the [Federal] Constitution and laws passed pursuant to it are as much laws in the States as laws passed by the state legislatures." *Howlett* v. *Rose*, 496 U.S. 356, 367 (1990). Thus, any application of state law that is preempted by a federal statute is null and void. *See Perez* v. *Campbell*, 402 U.S. 637, 652 (1971) (such laws are "rendered invalid by the Supremacy Clause" and "thus may not stand"). In those instances, in other words, the state law is entirely "without effect." *Maryland* v. *Louisiana*, 451 U.S. 725, 746 (1981).

60.     The Supreme Court has made clear that federal law can preempt state law both expressly or impliedly. *See Geier* v. *Am. Honda Motor Co., Inc.*, 529 U.S. 861, 869 (2000). Express preemption occurs when Congress's intent to foreclose state regulation is "explicitly stated in the statute's language." *Jones* v. *Rath Packing Co.*, 430 U.S. 519, 525 (1977). In such cases, courts are tasked with giving effect to the statute's "plain wording" to hold state law preempted. *In re WTC Disaster Site*, 414 F.3d 352, 372 (2d Cir. 2005) (internal quotation marks and citation omitted). Any state regulation within that scope is foreclosed.

61.     Federal courts find implied preemption when Congress's preemptive intent is "implicitly contained in [the statute's] structure and purpose." *Fid. Fed. Sav. & Loan Ass'n* v. *de la*

*Cuesta*, 458 U.S. 141, 153 (1982) (internal quotation marks omitted) (quoting *Jones* v. *Rath Packing Co.*, 430 U.S. 519, 525 (1977)). Field and conflict preemption are two different forms of implied preemption. *See Oneok, Inc.* v. *Learjet, Inc.*, 575 U.S. 373, 377 (2015). Field preemption occurs when Congress designs a comprehensive and detailed regulatory scheme that demonstrates Congress's intent to "occup[y] an entire field," making "even complementary state regulation . . . impermissible." *Arizona* v. *United States*, 567 U.S. 387, 401 (2012). And conflict preemption is triggered when state law represents "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Hines* v. *Davidowitz*, 312 U.S. 52, 67 (1941), whether the "'obstacle' goes by the name of 'conflicting; contrary to; . . . repugnance; difference; irreconcilability; inconsistency; violation; curtailment; . . . interference, or the like,'" *Geier* v. *Am. Honda Motor Co.*, 529 U.S. 861, 873 (2000) (citation omitted).

62.    Under any and all of these preemption frameworks, the Connecticut General Statutes and Connecticut Unfair Trade Practices Act are preempted to the extent Defendants seek to enforce these laws against Coinbase for offering access to event contracts on federally registered exchanges. Text, context, statutory structure, and common sense all militate in favor of preemption.

63.    Most fundamentally, Congress wrote express preemption language into the CEA, and that deliberate choice should be dispositive. Congress expressly granted the CFTC "exclusive jurisdiction" to regulate "accounts," "agreements," and "transactions involving swaps . . . traded or executed on a [federally designated] contract market." 7 U.S.C. § 2(a)(1)(A). The term "swaps" as defined in the CEA and as interpreted by the CFTC encompasses the event contracts that Coinbase hosts on its platform, including those that are related to sporting events. And contemporaneous dictionaries define "exclusive" as "[s]hutting out; debarring from interference or participation; vested in one [entity] alone," *Exclusive*, BLACK'S LAW DICTIONARY (5th ed. 1979), and similarly define "exclusive jurisdiction" as "power . . . over a[n entity] to the exclusion of all other[s]." *Exclusive*

*Jurisdiction*, BLACK'S LAW DICTIONARY (5th ed. 1979).    Accordingly, the CFTC's "exclusive

jurisdiction" over swaps traded on DCMs must be understood as precluding State "interference" with

transactions involving event contracts listed on federally registered exchanges.    And when, as here,

"Congress has made its [preemptive] intent known through explicit statutory language," *English* v. *Gen.*

*Elec. Co.*, 496 U.S. 72, 79 (1990), courts are tasked with giving effect to the statute's "plain wording"

to hold state law preempted.    *In re WTC Disaster Site*, 414 F.3d at 372 (internal quotation marks and

citation omitted).[26]

      64.    Indeed, federal courts have understood phrases like "exclusive jurisdiction" in other

federal statutes to broadly displace state law.    For example, the Third Circuit has reasoned that the

"explicit statutory conferral of exclusive jurisdiction" on a federal body—there, a federal court—over

a particular subject area "is a form of express preemption" that precludes state authority "over that

same subject matter." *Transcon. Gas Pipe Line Co., LLC* v. *Pa. Env't Hearing Bd.*, 108 F.4th 144, 151-52

(3d Cir. 2024); *see also, e.g.*, *Slaney* v. *Int'l Amateur Athletic Fed'n*, 244 F.3d 580, 594-595 (7th Cir. 2001)

(holding that a federal statute's grant of "exclusive jurisdiction" to the United States Olympic

Committee preempts state law).    That logic applies equally to Congress's explicit grant of exclusive

jurisdiction to the CFTC over swaps traded on DCMs.    Any state-law regulation of the transactions

falling within the CFTC's "exclusive jurisdiction," including event contracts traded on federally

registered exchanges, is thus expressly preempted.[27]

---

[26] Although some courts have analyzed Section 2's exclusive-jurisdiction provision through the lens of field, rather than express, preemption, *see, e.g. Hofmayer* v. *Dean Witter & Co.*, 459 F. Supp. 733, 737 (N.D. Cal. 1978), the critical point is that all these courts construed Section 2 to preempt state laws that would otherwise apply to derivative transactions on federally regulated exchanges. *Cf. Crosby* v. *Nat'l Foreign Trade Council*, 530 U.S. 363, 372 n.6 (2000) (recognizing that "the categories of preemption are not rigidly distinct") (cleaned up).

[27] The CEA's grant of exclusive jurisdiction contains limited carveouts.    The first preserves the independent jurisdiction of the SEC and other federal agencies over instruments within their preexisting statutory mandates.    The second provides a narrow grant of authority to States to enforce generally applicable laws against off-exchange transactions or against persons who fail to obtain CFTC registration.    7 U.S.C. § 16(e)(1); *see also see* H.R. Rep. No. 97-565, P. 1, at 43 (1982) (States may regulate

65.     The statutory context and history reinforce the clear import of the CEA's text.  As one commentator explained, "preemption was a central issue in the proceedings which culminated in the 1974 amendments to the CEA."  Kevin T. Van Wart, *Preemption and the Commodity Exchange Act*, 58 Chi.-Kent L. Rev. 657, 692 (1982) (emphasis omitted).  Congress understood that it would be unreasonable to expect investors and business owners relying on new technologies to navigate a patchwork of state-level gambling regulations; "[i]t [wa]s abundantly clear that all futures trading must be brought under a single regulatory umbrella."  H.R. Rep. No. 93-975, at 44-45 (1974).  The conference report accompanying the 1974 amendments made clear that the amendments were designed to "*preempt the field* insofar as futures regulation is concerned"; Congress did "not contemplate that there w[ould] be a need for any supplementary regulation by the States."  H.R. Rep. No. 93-1383, at 35-36 (emphasis added).  Federal courts have honored Congress's "firmly expressed" mandate that the "futures industry" be federally regulated, *Kelly* v. *Carr*, 691 F.2d 800, 803 (6th Cir. 1980), recognizing that any state law that would "directly affect trading on or the operation of a futures market" is preempted.  *Am. Ag. Movement*, 977 F.2d at 1157 (7th Cir. 1992).

66.     And in 2010, Congress took the same approach by vesting "exclusive jurisdiction" in the CFTC over, as relevant here, transactions "involving swaps or contracts" that are "traded or executed on a [designated] contract market."  7 U.S.C. § 2(a)(1)(A); *see* Barry Taylor-Brill, *Cracking the Preemption Code: The New Model for OTC Derivatives*, 13 Va. L. & Bus. Rev. 1, 3 (2019) (explaining that the 2010 amendment placed swaps "on the same exclusive jurisdictional footing as exchange-traded commodity futures").

---

"those who offer fraudulent *off-exchange* investments" and other "transactions *outside those preserved exclusively* for the jurisdiction of the CFTC" (emphasis added)).  Neither exception applies to the event contracts that Coinbase intends to make available to its customers because those contracts are traded exclusively on federally registered exchanges and do not fall within the portfolio of another federal agency.

67.    The extensive regulatory framework established by the CEA also demonstrates Congress's intent to occupy the field of commodity futures and swaps trading on CFTC-designated markets with federal regulation.  Pursuant to express statutory authority, the CFTC has created a comprehensive regulatory scheme to govern transactions encompassing event contracts traded on a DCM, from start to finish.  *See supra* ¶¶ 33–40

68.    Indeed, federal law governs every aspect of event-contract transactions on federally registered exchanges, facilitated by federally registered intermediaries.  First, the CFTC has exclusive jurisdiction to review and approve the event contracts themselves.  *See supra* ¶¶ 45, 49–50.  Second, the DCMs that list the contracts must be designated by the CFTC and are subject to extensive regulations under the CEA and the CFTC's rules, including those governing market access, trade integrity, and market monitoring (17 C.F.R. 38.151, 38.250-255), public disclosure of contract terms and market rules (17 C.F.R. 38.400-38.401), and protection of market participants from abusive practices (17 C.F.R. 38.650.651).  Third, FCMs—like Coinbase—that facilitate customer access to event contracts are subject to an additional layer of comprehensive regulatory oversight, which requires, among other things, maintaining minimum financial capital (17 C.F.R. 1.17), managing and disclosing conflicts of interest (17 C.F.R. 1.71), and safeguarding customer assets through strict segregation requirements (17 C.F.R. Part 22).  This three-layered federal regulatory scheme prohibits concurrent state authority over the same transactions; Connecticut's threats to enforce state law against Coinbase for those same transactions encroach on the field that the CFTC exclusively occupies.  Simply put, the CEA leaves no room for state participation in the regulation of swaps and event contracts traded on CFTC-designated exchanges.

69.    Additionally, Connecticut's enforcement of its state gambling laws against Coinbase would create an impermissible obstacle to achieving Congress's objectives and purposes.  *See Am. Agric. Movement*, 977 F.2d at 1156-57 (recognizing that any state law that would "directly affect trading

on or the operation of a futures market" is preempted). One of Congress's principal goals in enacting the CEA was to create a uniform approach to regulating futures, thereby preventing the "total chaos" that would ensue if "different State laws" could be applied to the futures market. *Commodity Futures Trading Commission Act: Hearings Before the S. Comm. on Agriculture & Forestry on S. 2485, S. 2578, S. 2837, and H.R. 13113*, 93d Cong. 685 (1974) (statement of Sen. Clark). In granting the CFTC "exclusive" jurisdiction over swaps traded on a DCM, Congress codified this objective into law. Permitting States—including Connecticut—to separately decide whether and how to regulate activity involving event contracts traded on a DCM would frustrate Congress's goal of creating uniformity in the futures market and necessarily create state-by-state "chaos."

70.     Defendants would subject Coinbase to legal requirements that are fundamentally inconsistent with the company's status as a nationwide FCM and would invite the "total chaos" that Congress intended to avoid via the CEA. For example, if Coinbase obtained a Connecticut sports-betting license—as the State alleges is legally mandated, *see* Ex. B at 2, the company would be required to restrict its services to only people who are physically located within Connecticut. Conn. Gen. Stat. §§ 12-863(a)(1)(B), (b)(A)(i) (2025). And if Coinbase intended to serve customers in nearby States, the company would be forced to obtain a similar license imposing similar geographic limitations. *See, e.g.*, N.Y. Racing, Pari-Mutuel Wagering & Breeding Law §§ 1367(1)(b), 1367-a(4)(a)(ii) (2025). Besides being impractical and prohibitively costly due to the compliance, capitalization, and other requirements Coinbase must adhere to as an FCM, these geographic barriers would sap prediction markets of their liquidity, a necessary element for survival because event contracts can only be executed if a buyer and a seller can be paired at the same odds (because, unlike a bookmaker, Coinbase is not on either side of the trade).

71.     Further, according to Connecticut, the DCMs with which Coinbase must partner are *also* subject to these geographic limitations. *See* Ex. B at 2. But it would be impossible for DCMs to

comply with this state-law restriction while also adhering to the federal-law requirement that DCMs provide "impartial [market] access" to all "persons with trading privileges," many of whom reside in one of the other 49 States.  17 C.F.R. 38.151(b).  Given these direct conflicts, state law must yield.

72.    In the ongoing prediction-markets litigation around the country, some States have argued that event contracts that pertain to sports are excluded from the CFTC's exclusive jurisdiction. This maneuver finds no support in the CEA's text, which does not generally condition the definition of a "swap" on the *type* of event or commodity to which the instrument refers.  *See* 7 U.S.C. § 1a(47)(A). The two exceptions to that rule are "onions" and "motion picture box office receipts," two products that Congress expressly excluded in the CEA's text itself.  *See* 7 U.S.C. § 1a(9).  Congress did not, however, exclude event contracts that pertain to sports.  *See NLRB* v. *SW Gen., Inc.*, 580 U.S. 288, 302 (2017) (the express inclusion of one item implies the exclusion of another left unmentioned).

73.    The State's atextual carveout for sports-related event contracts also creates serious administrability concerns.  Would a DCM run afoul of the State's proposed rule if it offered contracts on "whether the Yankees will make the playoffs in 2026," but not if it offers a substantively equivalent contract asking "whether Yankee Stadium's parking lot will be at capacity in October 2026"?  The States have yet to articulate any principled position on *which* sports-related contracts, in their view, fall outside the CFTC's ambit.  *Cf.* Conn. Gen. Stat. Ann. § 53-278a(2) (2025) (defining gambling as "risking any money . . . for gain contingent in whole or in part upon . . . chance");  N.Y. Penal Law § 225.00(2) ("[g]ambling" encompasses "risk[ing] something of value upon the outcome of . . . a future contingent event not under his control or influence, upon an agreement or understanding that he will receive something of value in the event of a certain outcome").  But the need for clear, workable lines is paramount when the price of getting it wrong could be criminal liability.  There is simply no reason to force courts and market participants to engage in this tightrope act when the CEA's text, statutory

structure, purpose, and history all point towards a comprehensive federal regulatory scheme that governs all event contracts, with no exception for sports-related event contracts.

74.     Moreover, the States' attempts to enforce their gambling laws against these event contracts are premised on the thesis that these contracts involve gaming.  But the 2010 Special Rule expressly grants the CFTC authority to "review" event contracts involving "gaming" to determine if such contracts are "contrary to the public interest."  7 U.S.C. § 7a-2(c); *see supra* ¶ 45.  If the States were right that event contracts are not "swaps" because they concern gaming, they would fall outside the CFTC's jurisdiction altogether, making this provision of the Special Rule entirely superfluous. There is no basis to read that language out of the statute.  *See Pulsifer* v. *United States*, 601 U.S. 124, 143 (2024) ("the canon against surplusage applies with special force" when a proposed statutory construction "render[s] an entire subparagraph meaningless" (brackets in original)).

75.     Although such event contracts sometimes concern the same underlying events as state-regulated sportsbooks, the financial products themselves are markedly different.  Unlike traditional sportsbooks, exchange-traded event contracts of all stripes, including sports-related event contracts, are derivative instruments listed on centralized exchanges pursuant to extensive federal product-certification, registration, and approval procedures.  Event-contract prices are formed by matching buyers and sellers among diverse market participants on these national exchanges, much like a public company's stock price is set at the New York Stock Exchange through the buying and selling of its securities.

76.     In other words, like all other derivative exchanges, an exchange that lists event contracts serves as a neutral market operator; it does not take proprietary positions, choose prices, or otherwise act as a counterparty to its members' trades.[28]  And FCM intermediaries, like Coinbase,

---

[28] Kalshi, like other DCMs, does administer a market-maker program through which Kalshi Trading LLC, a subsidiary of Kalshi Inc., can participate in the market.  But exchanges commonly rely on market makers.  *See, e.g.*, *In re Nasdaq Market-Makers Antitrust Litig.*, 894 F. Supp. 703, 705 (S.D.N.Y.

likewise do not take the other side of their customers' trades but instead act as execution and clearing agents that facilitate access to these markets. Event-contract prices therefore reflect the collective judgment of a broad, competitive market, producing efficient price discovery and minimizing informational and pricing asymmetries among participants.

77.     Traditional sports betting, by contrast, is conducted through local sportsbooks—regulated at the state level—with each sportsbook independently setting the terms of its wagers and acting as the counterparty to each bettor, who bets against the house. See *United States* v. *McCoy*, 539 F.2d 1050, 1059 (5th Cir. 1976). The odds offered by a sportsbook—the functional equivalent of price—are therefore determined not by transparent competition across a unified market but by the operator's own risk exposure and revenue objectives within a limited geographic customer base. In other words, the sportsbook's interest is directly adverse to that of its bettors: It earns money from the "vig," or commission, embedded in the odds of each wager.[29] See *United States* v. *Greco*, 619 F.2d 635, 637 (7th Cir. 1980) ("This amount of profit to the bookmaker is commonly referred to as 'vigorish', 'vig' or 'juice.'").

---

1995) (explaining that "[o]n average there are 11 market-makers for a Nasdaq stock"). "Market makers are individual traders appointed by [an exchange] to maintain a fair, orderly and liquid market," *Spicer* v. *Chicago Bd. of Options Exch., Inc.*, 977 F.2d 255, 256 (7th Cir. 1992), and they play a critical role in facilitating price discovery by supplying baseline liquidity that enables efficient entry and exist. *See Newton* v. *Merrill, Lynch, Pierce, Fenner & Smith, Inc.*, 135 F.3d 266, 268 (3d Cir. 1998) (en banc) ("[M]arket makers create liquidity by being continuously willing to buy and sell the [instrument] in which they are making a market."). Critically, Kalshi Trading enjoys no special privileges relative to any other trader on the exchange. Indeed, Kalshi maintains "strict informational barriers" between its DCM and Kalshi Trading. *See Who are you trading with?*, Kalshi Help Center, https://help.kalshi.com/trading/who-are-you-trading-with. Thus, Kalshi Trading is "a participant on the [Kalshi] exchange just like everyone else." *Id.*

[29] *See* Katherine Sayre, *Sports Betting Companies Weed Out Winners. Gamblers Want to Know Why. Bettors and Regulators Seek More Clarity on Why Platforms Limit Wagers by Some Successful Customers*, Wall. St. J. (July 14, 2024), https://tinyurl.com/58ef9m42.

\* \* \*

78.    The CEA thus preempts Connecticut's law many times over.  Indeed, nearly every court to interpret Section 2(a)(1)(A)'s grant of exclusive jurisdiction has construed that provision to preempt state laws that purport to regulate transactions on CFTC-regulated exchanges.[30]  And Congress has never considered disturbing this judicial consensus.  Just the opposite:  Congress has *broadened* the CEA's reach by adding "swaps" to the CFTC's exclusive jurisdiction and conferring special discretion on the Commission to review and prohibit particular event contracts.  *See supra* [\*\*].  These amendments, moreover, came against a settled backdrop of judicial opinions interpreting the CEA to preempt state-law regulation of covered transactions.  Those amendments thus provide forceful evidence that Congress intended for the CEA to be construed broadly.  *Cf. Goodyear Atomic Corp.* v. *Miller*, 486 U.S. 174, 176 (1988) (Congress is presumed to know the state of the "existing law pertinent to the legislation it enacts").

79.    As courts have recognized time and again, when it comes to inherently interstate technologies like online event-contract markets, federal rules are generally preferable to state ones.  *See, e.g.*, *Am. Booksellers Found.* v. *Dean*, 342 F.3d 96, 104 (2d Cir. 2003); *ACLU* v. *Johnson*, 194 F.3d

---

[30]  *See, e.g.*, *Am. Agric. Movement*, 977 F.2d at 1156 (state law affecting trading on a futures market is preempted); *Leist* v. *Simplot*, 638 F.2d 283, 322 (2d Cir. 1980) ("§ 2(a)(1) of the CEA preempts the application of state law."); *Jones* v. B.*C. Christopher & Co.*, 466 F. Supp. 213, 220 (D. Kan. 1979) ("[S]tate regulatory agencies are . . . preempted by the 'exclusive jurisdiction' of the CFTC."); *Hofmayer* v. *Dean Witter & Co.*, 459 F. Supp. 733, 737 (N.D. Cal. 1978) (highlighting Congress's "plainly stated intent to . . . preempt the field of regulation of commodity futures trading"); *Paine, Webber, Jackson & Curtis, Inc.* v. *Conaway*, 515 F. Supp. 202, 204-07 (N.D. Ala. 1981) (Alabama gambling law voiding futures contracts not intended for delivery is preempted); *Int'l Trading, Ltd.* v. *Bell*, 556 S.W.2d 420, 423-24 (Ark. 1977) (emphasizing Congress' "clear intention to vest exclusive jurisdiction of the regulation of commodity options in the [CFTC] and to supersede the jurisdiction of all state and federal agencies."); ; *Clayton Brokerage Co. of St. Louis, Inc.* v. *Mouer*, 531 S.W.2d 805, 806 (Tex. 1975) (Texas securities law applied to "London commodity options" is preempted); *see also KalshiEX LLC* v. *Flaherty*, 2025 WL 1218313, at \*5 (D.N.J. Apr. 28, 2025) (CEA's "exclusive-jurisdiction language reflects an intent to occupy the field").  *But see KalshiEX LLC* v. *Martin*, 793 F. Supp. 3d 667, 676 (D. Md. 2025) (finding that the CEA does not preempt Maryland's gaming laws); *KalshiEX LLC* v. *Hendrick*, 2025 WL 3286282, at \*1 (D. Nev. Nov. 24, 2025) (finding that the CEA does not preempt Nevada's gaming laws).

1149, 1162 (10th Cir. 1999). And given the impracticality of complying with 50 state laws and 50 different standards, Connecticut must show that Congress blessed a state-by-state legislative regime that would effectively make "the most stringent" state "standard" a *de facto* national standard, turning our system of federalism upside down and raising serious Dormant Commerce Clause concerns. *Am. Libraries Ass'n* v. *Pataki*, 969 F. Supp. 160, 183 (S.D.N.Y. 1997). Connecticut cannot provide any such evidence—all textual, structural, and historical indicia are to the contrary.

80.    Accordingly, Coinbase is entitled to a preliminary injunction. To obtain a preliminary injunction, the moving party must show that (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm without immediate relief; (3) the balance of the equities supports equitable relief; and (4) the injunction is in the public's interest. *Winter* v. *Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). As explained above, Coinbase is likely to succeed on the merits because the CEA preempts Connecticut law several times over.

81.    Additionally, Coinbase will suffer irreparable harm without injunctive relief. It is hornbook law that a regulated party satisfies the irreparable-harm prong if the party risks ruinous criminal or civil liability by failing to comply with a preempted state law. *Ex parte Young*, 209 U.S. 123, 148 (1908). This case perfectly illustrates why. Unless and until Coinbase obtains clarity about whether Connecticut gambling laws are preempted as to event contracts traded on federally registered exchanges, Coinbase confronts a Hobson's choice. The company must either refrain from offering sports event contracts on its platforms altogether—even though they are a critical part of the company's business plan and a product that Coinbase has invested significant resources building over the last six months for its customers—or risk becoming the subject of a bet-the-farm enforcement action. Connecticut laws are clear on this front: If Coinbase is judged to have violated Connecticut General Statutes and Connecticut Unfair Trade Practices Act—all of which the State wrongly

contends cover Coinbase's offering of sports-based event contracts—then it will be subject to civil (or even criminal) penalties. *See* Ex. B at 2.

82.     Coinbase is not required to wait until it is the subject of an inevitable enforcement action before seeking such relief. *See Free Enterprise Fund* v. *PCAOB*, 561 U.S. 477, 490-91 (2010) ("We normally do not require plaintiffs to bet the farm by taking the violative action before testing the validity of the law."). To the contrary, both declaratory and injunctive relief were designed for precisely these circumstances. *See Morales* v. *Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992) (federal courts may enjoin state officers "who threaten and are about to commence proceedings" to enforce "an unconstitutional act" against regulated parties); *Steffel* v. *Thompson*, 415 U.S. 452, 459 (1974) (declaratory relief ensures that a plaintiff does not need to "expose himself to actual arrest or prosecution" before "challeng[ing] a statute that he claims deters the exercise of his constitutional rights").

83.     Connecticut's threats also jeopardize Coinbase's reputation as a company that complies with all relevant federal and state laws. That is a crucial pillar of Coinbase's business strategy; the company has won investors' and consumers' trust by establishing a name for itself as a sophisticated, law-abiding player in the industry. That hard-earned reputation is critical to Coinbase's mission of building a new and transparent financial system. Without it, Coinbase would not be able to partner with millions of Americans who purchase digital assets on its platforms. Absent correction, Connecticut's public stance that a critical piece of Coinbase's business violates the State's gambling laws threatens to erode the company's good name and standing.

84.     Meanwhile, if Coinbase instead refrains from offering Connecticut users access to prediction markets until it eventually obtains a favorable final judgment, Coinbase would risk losing the goodwill of its customers and market share while waiting for legal certainty—and neither type of loss would be easily recoverable through routine litigation. These threats to Coinbase thus constitute

additional irreparable harms. *See Register.com, Inc.* v. *Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004) (characterizing "loss of reputation, good will, and business opportunities" as irreparable harms). And the doctrine of sovereign immunity would bar Coinbase from obtaining monetary damages at the end of this litigation, even if those damages could be calculated. *See Am. Fin. Servs. Assn.* v. *Burke*, 169 F. Supp. 2d 62, 70 (D. Conn. 2001). Selectively prohibiting Connecticut users from accessing event contracts on Kalshi's exchange, moreover, puts Coinbase and its partner at risk of being accused of violating *federal* law, which requires a federally registered exchange to provide "impartial access to its markets and services." 17 C.F.R. 38.151(b).

85.    Coinbase also satisfies the other prongs of the preliminary-injunction test. The balance of the equities decisively cuts in Coinbase's favor because Connecticut has no cognizable interest in enforcing state laws when those laws are preempted by federal law. *See Felder* v. *Casey*, 487 U.S. 131, 138 (1988) ("Under the Supremacy Clause of the Federal Constitution, the relative importance to the State of its own law is not material when there is a conflict with a valid federal law" (citation and quotation marks omitted)). And likewise, the public's interest is in ensuring that the State follows the Constitution, which establishes the supremacy of federal law. *Antonyuk* v. *Bruen*, 624 F. Supp. 3d 210, 261 n.50 (N.D.N.Y. 2022) (alteration in original) (internal quotation marks and citation omitted) ("It is in the public interest not to perpetrate the unconstitutional application of a statute.").

86.    Granting injunctive relief to Coinbase appropriately recognizes that the CFTC has permitted a large and robust market in sports-related event contracts to flourish, creating substantial reliance interests among all market participants. In July of this year, Kalshi announced that it had so far facilitated more than $2 billion in sports-related event contract trades. Based in large part on that growth, Kalshi's value to its investors has increased by more than five-and-a-half times just in the last

six months.[31]  Coinbase and other market facilitators being targeted by state gambling regulators have devoted significant resources to building CEA-compliant infrastructure to host event contract trading given substantial interest from investors and consumers, and Connecticut's actions takes direct aim at those extensive efforts taken in compliance with federal law.

87.    For these reasons, Coinbase seeks declaratory and injunctive relief preventing Defendants from enforcing Connecticut laws insofar as they seek to prohibit Coinbase from offering sports event contracts traded on a CFTC-designated exchange.

## PRAYER FOR RELIEF

Wherefore, Plaintiff Coinbase respectfully requests that this Court enter judgment in Coinbase's favor and against Defendants as follows:

(i)    Issue a preliminary and permanent injunction prohibiting Defendants and their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction from enforcing against Coinbase the Connecticut General Statutes, Connecticut Unfair Trade Practices Act, any rules adopted thereunder, and any other Connecticut law that attempts to regulate Coinbase's involvement in transactions encompassing event contracts traded on a DCM;

(ii)    Award a declaratory judgment that the Connecticut General Statutes, Connecticut Unfair Trade Practices Act, any rules adopted thereunder, and any other Connecticut law are preempted by federal law, and thus violate the Supremacy Clause of the United States Constitution, insofar as Defendants seek to apply these laws to prohibit Coinbase from offering customers access to event contracts traded on a DCM; and

---

[31] Marina Temkin, *Kalshi's Valuation Jumps to $11B After Raising Massive $1B Round* (Nov. 20, 2025), https://techcrunch.com/2025/11/20/source-kalshis-valuation-jumps-to-11b-after-raising-massive-1b-round/.

(iii)     Grant any further relief that the Court deems just and proper.

Dated:  December 18, 2025                    Respectfully submitted,

                                             By: */s/ Steven L. Holley*
                                             Steven L. Holley (ct09198)
                                             Benjamin R. Walker (*pro hac vice* pending)
                                             Yaira Dubin (*pro hac vice* pending)
                                             Akash M. Toprani (*pro hac vice* pending)
                                             **SULLIVAN & CROMWELL LLP**
                                             125 Broad Street
                                             New York, NY 10004
                                             Tel: (212) 558-4000
                                             Fax: (212) 558-3588
                                             holleys@sullcrom.com
                                             walkerb@sullcrom.com
                                             dubiny@sullcrom.com
                                             toprania@sullcrom.com

                                             Jeffrey B. Wall (*pro hac vice* pending)
                                             James M. McDonald (*pro hac vice* pending)
                                             Rishabh Bhandari (*pro hac vice* pending)
                                             1700 New York Avenue, N.W.
                                             Washington, D.C., 20006
                                             Tel: (202) 956-7500
                                             Fax: (202) 293-6330
                                             wallj@sullcrom.com
                                             mcdonaldj@sullcrom.com
                                             bhandarir@sullcrom.com

                                             *Counsel for Plaintiff Coinbase Financial*
                                             *Markets, Inc.*