**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| COINBASE FINANCIAL MARKETS, INC., <br><br>*Plaintiff* <br><br> v. <br><br> WILLIAM TONG in his official capacity as Attorney General of Connecticut; BRYAN T. CAFFERELLI, in his official capacity as Commissioner of the Connecticut Department of Consumer Protection; and KRISTOFER GILMAN, in his official capacity as Director of Gaming for the Connecticut Department of Consumer Protection, <br><br> *Defendants* | Case No.: 3:25-cv-02121 (VDO) <br><br><br> **DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION** <br><br><br><br><br><br> January 9, 2026 |

## INTRODUCTION

Coinbase Financial Markets, Inc. ("Coinbase") wants to offer Kalshi event contracts, including those representing illegal sports gambling, to its millions of users alongside cryptocurrencies and other financial products. Its motion to enjoin State officials from enforcing State law as to sports event contracts fails for the same reasons as Kalshi's similar motion, [ECF 30] *KalshiEX LLC v. Cafferelli*, No. 3:25-cv-2016 (VDO) ("*Kalshi*"). As fully argued in *Kalshi*, these contracts are unlicensed, unlawful sports wagers disguised as financial products and State gambling law is not preempted as applied to them. Coinbase fails to demonstrate that it faces irreparable harm and that the public interest warrants an injunction allowing it to increase users' access to these unlawful contracts through its platform.

Coinbase's claim depends wholly on Kalshi's ability to offer sports event contracts and the main legal issues are nearly identical to those in *Kalshi*. For brevity,

Defendants respectfully incorporate in full their arguments in their *Kalshi* opposition brief filed today [ECF 45] *Kalshi* ("*Kalshi* Defs'. Br."), and address here only new or different issues raised by Coinbase's Motion.

## CONTENTS

BACKGROUND ................................................................................................................. 2
    A.    The Parties ................................................................................................... 2
    B.    Coinbase seeks to insert itself into an unlicensed sports wagering scheme. ............. 3
PROCEDURAL HISTORY .................................................................................................. 4
ARGUMENT ....................................................................................................................... 4
    I.    Coinbase cannot show a clear or substantial likelihood of success on the merits. ....... 4
        a.    Sports event contracts are not "associated with a potential financial, economic, or commercial consequence." ................................................................. 4
        b.    The CEA does not expressly preempt Connecticut's gambling law. ..................... 5
        c.    Enforcing state law does not undermine CFTC authority. ................................... 6
        d.    DCMs and FCMs are not different from sportsbooks in any relevant way. ........... 6
    II.    Coinbase cannot show it is likely to suffer irreparable harm absent a preliminary injunction. ....................................................................................................... 8
    III.    The public interest weighs against granting a preliminary injunction. ........................ 10
    IV.    Coinbase should be required to post a bond. ............................................................ 10
CONCLUSION ................................................................................................................... 10

## BACKGROUND

### A.    The Parties

**Plaintiff**

Coinbase is registered with the Commodity Futures Trading Commission ("CFTC") as a futures commission merchant ("FCM"), permitting it to solicit or accept orders for swaps or other derivatives. *See* 7 U.S.C. § 1a(28)(A). It "serves as an intermediary for customers trading regulated derivatives listed on a DCM [designated contract market], including event contracts on Kalshi." [ECF 1 ¶ 5.]

2

**Defendants**

Coinbase sues Connecticut Attorney General William Tong, Commissioner of the Department of Consumer Protection ("DCP") Bryan Cafferelli, and DCP's Director of Gaming, Kristofer Gilman. All defendants are sued in their official capacities.

The defendants in this action are the same as those in the *Kalshi* suit, except that Coinbase, unlike Kalshi, does not name DCP itself as a defendant.

**B. Coinbase seeks to insert itself into an unlicensed sports wagering scheme.**

Coinbase wants to partake in the "multi-billion-dollar industry" for event contracts by offering Kalshi's event contracts, specifically including its sports event contracts, to "its millions of users" starting in January 2026. [ECF 1 ¶¶ 4, 5.] Coinbase knows DCP and regulators in numerous other states have identified sports event contracts as illegal gambling for many months. Nevertheless, Coinbase seeks to launch a partnership with Kalshi that includes sports event contracts, despite (i) the CFTC's banning event contracts involving gaming or violations of state law in 17 C.F.R. § 40.11, (ii) the CFTC staff's September 2025 advisory warning FCMs to prepare for state regulatory action relating to sports event contracts; and (iii) at least four District Court decisions—including one against Robinhood, a similarly-situated FCM—denying sports event contracts protection from state gambling laws. *Robinhood Derivatives, LLC v. Dreitzer*, No. No. 2:25-cv-1541, 2025 U.S. Dist. LEXIS 231144, at *1 (D. Nev. Nov. 25, 2025) ("*Robinhood*").[1]

---

[1] The other referenced cases are *KalshiEX LLC v. Martin*, No. 25-cv-1283, 2025 U.S. Dist. LEXIS 147815, at *1 (D. Md. Aug. 1, 2025) *appeal docketed*, No. 25-1892 (4th Cir. Aug. 6, 2025); *KalshiEx, LLC v. Hendrick*, No. 2:25-cv-575, 2025 U.S. Dist. LEXIS 234246, at *32 (D. Nev. Nov. 24, 2025); *N. Am. Derivatives Exch., Inc. v. Nevada ex rel. Nev. Gaming Ctrl. Bd.*, No. 2:25-cv-978, 2025 U.S. Dist. LEXIS 202104, at *1 (D. Nev. Oct. 14, 2025).

Coinbase does not allege that DCP has threatened regulatory action as to Coinbase directly, but that cease-and-desist letters issued by DCP related to sports event contracts reflect an intent to subject Coinbase and similarly situated companies to state gambling law, which it claims is preempted. [ECF 1 ¶ 8, 9.]

## PROCEDURAL HISTORY

Coinbase filed this action and its Motion on December 18, 2025. The action was initially assigned to Judge Russell and then transferred to this Court on December 23, 2025, where the *Kalshi* suit was already pending.

## ARGUMENT

For the reasons stated in Defendants' opposition to Kalshi's Motion for Preliminary Injunction, which Defendants respectfully incorporate here, there is no basis for a preliminary injunction. Indeed, Coinbase's Motion stands on even weaker footing because Coinbase does not currently provide sports event contracts and because it makes almost no attempt to demonstrate irreparable harm.

### I. Coinbase cannot show a clear or substantial likelihood of success on the merits.

#### a. Sports event contracts are not "associated with a potential financial, economic, or commercial consequence."

Coinbase's claim that sports event contracts relate to a "potential financial, economic, or commercial consequence" strains credulity. Even if it is possible to conceive of an event contract hedging against genuine financial consequences associated with the occurrence of a sporting event, those are not the contracts at issue in DCP's cease-and-desist letter. The event contracts that make this a "multi-billion-dollar industry" [ECF 1 ¶ 4] are surely not contracts relating to economic consequences from the MLB moving the All-Star game from Atlanta to Denver, or UCONN basketball's

4

overall economic impact on Storrs [ECF 5-1 at 22]—they are contracts over the game winner, the number of runs, the top points scorer, the method by which a match is won, or whether a certain statistic will be achieved during a game. These contracts are gambling, pure and simple, and have no tangible economic impacts other than that people bet on them.

### b. The CEA does not expressly preempt Connecticut's gambling law.

Going a step further than Kalshi, Coinbase argues that the CEA preempts State law expressly. [ECF 5-1 at 13.] This argument fails for the same reasons articulated in Defendants' *Kalshi* brief. Coinbase's argument begins and ends with the two words "exclusive jurisdiction" from 7 U.S.C. § 2(a)(1)(A). As argued in *Kalshi*, that provision is subject to language in the Dodd-Frank Act limiting the CEA's preemptive effect as to, and intentionally preserving, State law. Congress could have explicitly preempted the application of state gaming (or other) law but did not. *See Kalshi* Defs'. Br. § I.c.i.

The cases cited by Coinbase do not support its argument. They merely repeat that the CFTC has exclusive jurisdiction in certain areas related to derivatives trading, which is clear. [ECF 5-1 at 22-23.] Defendants do not dispute that § 2(a)(1)(A) expressly "confers exclusive jurisdiction to the CFTC over a limited, discrete set of items related to the making of futures contracts." *FTC v. Ken Roberts Co.*, 276 F.3d 583, 589 (D.C. Cir. 2001)*.* But, like the Second Circuit's decision in *Leist*, *see Kalshi* Defs'. Br. 24 n.10, none of Coinbase's cases addresses the interplay of CFTC jurisdiction and state law in an area historically reserved to the states' police powers and specifically excluded from commodities markets, let alone one where the CEA expressly preserves state law, as it does in 7 U.S.C. § 16 and in the Special Rule. *See Jones v. B.C. Christopher & Co.*,

5

466 F. Supp. 213, 220 (D. Kan. 1979) (permitting private cause of action under CEA against commodity trading firm for executing trades for "unsuitable" client); *Int'l Trading, Ltd. v. Bell*, 262 Ark. 244, 251 (1977) (finding CEA preempted state securities regulator's enforcement action over commodity futures sales); *State v. Monex Int'l, Ltd.*, 527 S.W.2d 804, 806 (Tex. Civ. App. 1975) (similar, for margin account sales). Coinbase's cases do not begin to demonstrate Congress clearly intended to preempt State regulation over gambling simply because a CEA-regulated swap may be involved.

### c. Enforcing state law does not undermine CFTC authority.

Coinbase appears to argue that State regulation of derivatives' "underliers" (here, illegal gambling) undermines federal authority because it could lead to conflicts between States and the CFTC over the types of futures eligible for trading on CFTC exchanges. [ECF 5-1 at 21.] There is no such conflict in this case. Here, it is clear that deferring to State regulation of gambling *respects*, not undermines, federal authority because the CFTC, with express authority from Congress, expressly singled out both gaming and conduct violating state law as being out of bounds for trading on the nation's commodities exchanges. 7 U.S.C. § 7a-2(c)(5)(C); 17 C.F.R. § 40.11(a). Here, it is Coinbase and Kalshi, not any State, who appear to be challenging federal authority.

### d. DCMs and FCMs are not different from sportsbooks in any relevant way.

Coinbase tries to draw a line between sports event wagers and sportsbooks, assuring the Court that it can declare sports event contracts to be swaps without concluding that sportsbooks (and, for that matter, casino games) are. [ECF 5-1 at 19-21.] There is no basis to draw that line. The sports event contracts at issue in DCP's cease-and-desist letter are substantively the same as sports gambling and, unlike

6

insurance or securities, they have no categorical pedigree of being regulated as anything other than gambling. If such contracts are swaps, so are sportsbooks' offerings, with all the absurd and unworkable consequences that that would entail.

<u>First</u>, whether a DCM acts exactly like a sportsbook, or has exactly the same incentives, is not a valid test to conclude that its sports event contracts are swaps—or that sportsbooks' offerings are not. It is not the structural details such as who sets the odds that makes sports wagering gambling; it is that the conduct poses the same moral and practical dangers as any other form of gambling, including addiction and financial harms. In this way, sports event contracts are indistinguishable from sports betting but clearly distinct from event contracts resembling more traditional swaps or other futures; it is unlikely that anyone is addicted to trading event contracts on weather events or credit defaults. To draw an artificial line conveniently insulating Kalshi's wagers but not sportsbooks from state regulation based on technical features is to ignore the practical reality of what sports event contracts are and the risks they pose.

<u>Second</u>, Coinbase's proposed distinction between sports event contracts and sportsbooks based on how they are "traditionally regulated" [ECF 5-1 at 20-21], misses the point. Sports event contracts, as such, have never been "traditionally" regulated as anything, because they have not existed at all until very recently. After all, Kalshi portrays event contracts themselves as innovative and visionary, *About*, Kalshi, https://perma.cc/N8QN-BTAZ, and only began offering sports event contracts in January 2025. Traditionally, sports *wagers* have been regulated as gambling; they have not been traded on derivatives markets. A focus on structural characteristics might be appropriate if this case involved contracts related to "underliers" like those of traditional swaps, such

as energy, interest rates, or credit defaults. But sports event contracts are simply not like these others; they are fin-tech companies' attempt to skirt State regulation over a subject matter that States have always regulated.

In sum, if the Court concludes Kalshi's sports event contracts are swaps, it is difficult to see how sportsbooks' (and casinos') wagers are not also swaps, with the absurd and unworkable results that that would entail.

## II.     Coinbase cannot show it is likely to suffer irreparable harm absent a preliminary injunction.

Coinbase's claim to fear irreparable harm is notably sparse, even though "[a] showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction," *JTH Tax, LLC v. Agnant*, 62 F.4th 658, 672 (2d Cir. 2023) (cleaned up). Coinbase does not even attempt to argue that not offering sports event contracts in Connecticut is impossible or cost prohibitive. Coinbase also does not currently offer Kalshi's event contracts, sports-related or otherwise, so its claims to suffer harm from not offering them are highly speculative. Coinbase is not a DCM that could even theoretically fear repercussions from the CFTC. And, any reputation or goodwill loss is both speculative and self-inflicted.

First, as of the date of Coinbase's Complaint, it apparently has not begun offering Kalshi event contracts. The Second Circuit places a high burden on movants claiming irreparable harm from an alleged inability to enter a new and unproven line of business, one Coinbase cannot meet. Coinbase makes no showing that sports event contracts are a "truly unique opportunity" for it, or that there is no "reasonable substitute[]" for them, as required by *Tom Doherty Assocs. v. Saban Entm't, Inc.*, 60 F.3d 27, 38 (2d Cir.

1995). There is of course a legal substitute for sports event contracts: licensed sports wagers compliant with Connecticut law.

Even if Coinbase begins offering Kalshi event contracts before this Motion is decided, that is Coinbase's own decision, and if the Court ultimately denies it an injunction that leads to commercial losses as a result of enforcement action, those losses, like Kalshi's, are wholly self-inflicted. *Kalshi* Defs'. Br. 33-34.

<u>Second</u>, and relatedly, because Coinbase does not currently offer Kalshi sports event contracts, it cannot credibly claim any loss of goodwill or reputational harm in connection with not offering them in Connecticut. Coinbase has no reputation as an offeror of Kalshi's sports event contracts and, if it develops one, it will be in the context of having decided to push ahead with offering them despite knowing of major risks of state regulatory action, as evidenced by its filing of this case.

<u>Third</u>, Coinbase cannot credibly claim any fear of regulatory action from the CFTC if it is ultimately required to stop offering sports event contracts in Connecticut. Coinbase is not a DCM and does not appear to be subject to the CFTC's "core principles," enforcement of which Kalshi claims (speculatively) may harm it. In support of its claim of irreparable harm, Coinbase cites only the impartial access requirement in 17 C.F.R. § 38.151(b) [ECF 5-1 at 27], which by its own terms applies to DCMs, not FCMs. Even if this principle applied to Coinbase, it is not a genuine basis to fear federal regulatory action. *Kalshi* Defs'. Br. 27-28, 31-32. Defendants note that Robinhood, another FCM offering Kalshi's contracts, reportedly stopped offering such contracts in at least one state after being denied an injunction against regulators there. *Robinhood freezes sports event contracts in Nevada after injunction denied*, Public Gaming

9

Research Institute (Nov. 26, 2025) https://perma.cc/8PWM-ZLQ3; *See Robinhood*, 2025 U.S. Dist. LEXIS 231144, at *1. It is evidently possible to do so without existential regulatory risk.

### III.  The public interest weighs against granting a preliminary injunction.

The same public interest considerations applying to Kalshi apply equally to Coinbase. *Kalshi* Def's. Br. § III. Coinbase seeks to propagate Kalshi's unlawful event contracts to "millions" of users, magnifying the public harms those contracts pose. Arguably even more deceptively than Kalshi, Coinbase intends to offer sports event contracts alongside putative investment options on its platform, further conflating these gambling contracts with financial products. The public interest does not support permitting Coinbase to offer Kalshi's sports event contracts pending litigation, particularly in light of Coinbase's threadbare showing of irreparable harm and its remote chance of success on the merits.

### IV.  Coinbase should be required to post a bond.

Coinbase should be required to post a bond on the same basis as, and in an amount not less than, Kalshi. *Kalshi* Defs'. Br. § IV.

### CONCLUSION

For the foregoing reasons and those stated in Defendants' *Kalshi* brief, Coinbase's Motion should be denied.

Respectfully submitted,

**DEFENDANTS**

WILLIAM TONG,
BRYAN CAFFERELLI,
KRISTOFER GILMAN

**WILLIAM TONG
ATTORNEY GENERAL**

BY: <u>*/s/     Joseph E. Gasser*          </u>
     Joseph E. Gasser, No. ct30299
     Michael Nunes, No. ct31522
     Assistant Attorneys General
     Office of the Attorney General
     165 Capitol Avenue
     Hartford, CT 06106
     Phone: 860-808-5400
     Fax: 860-808-5593
     joseph.gasser@ct.gov
     michael.nunes@ct.gov